**FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JUL 2 3 2015

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  **4:15CR343 CEJ/TCM** |
| | ) | |
| ZIA IQBAL, | ) | |
| | ) | |
| Defendant. | ) | |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

1.     At all times relevant to this indictment, the defendant Zia Iqbal, a resident of St. Louis County, owned and operated a company called Spinnaker, LLC, located in Chesterfield, Missouri.  Incorporated in Missouri in 2006, Spinnaker provided practice management, marketing, and consulting services to physicians and other health care providers.

2.     At all times relevant to this indictment, Patient Care Professionals (referred to hereafter as PCP) was a home health care agency, located in Ballwin Missouri.  PCP provided home care services to patients, whose doctors certified their need for home care services.

### Relevant Medicare Provisions

3.     The Medicare Program is a federal health benefits program for the elderly, disabled, and ESRD (end stage renal disease) patients.  In general, Part A of the Medicare Program authorizes payment of federal funds to health care professionals for care provided to patients in hospitals and skilled nursing facilities and for patients requiring home health services,

1

such as intermittent skilled nursing care and physical, speech and continued occupational therapy.

4.      The United States Department of Health and Human Services (HHS), through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program. CMS acts through fiscal agents, which are private companies that review claims and make payments to providers for services rendered to Medicare beneficiaries.

5.      To receive Medicare reimbursement, providers must submit a written application and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. The Medicare application, specifically Section 14, entitled "Penalties for Falsifying Information," informs the provider that federal criminal law prohibits (a) the making or use of false or fraudulent statements, representations, or documents, (b) the concealment or cover-up by trick, device, or deceit of a material fact, and (c) the execution of a fraud scheme, if these actions are related to the delivery or payments for health care benefits, items or services.

6.      The provider must sign Section 15, entitled "Certification Statement," of the Medicare application, which states:

> I agree to abide by the Medicare laws, regulations, and program instructions
> [which] are available through the fee-for-service contractor. I understand that
> payment of a claim by Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations, and program instructions
> (including, but not limited to, the Federal anti-kick statute and the Stark law), and
> on the supplier's compliance with all applicable conditions of participation.

### Relevant Missouri Medicaid Provisions

7.      MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients.

8.      A Medicaid provider must enter into a written agreement with the Missouri Division of Medical Services (DMS) to receive reimbursement for medical services to Medicaid recipients and must agree to abide by DMS's regulations in rendering and billing for those services.

## Anti-kickback Statute

9.      The Medicare and Medicaid Patient Protection Act of 1987, as amended, 42 U.S.C. §1320a-7b (the "Anti-kickback Statute"), prohibits any person or entity from knowingly and willfully soliciting, making, or accepting remunerations to induce or reward any person for referring, recommending, or arranging for federally funded medical services provided under the Medicare and Medicaid programs.  42 U.S.C. § 1320a-7b(b).  Remuneration is defined broadly as anything of value, including money, goods, services, or the release or forgiveness of financial obligations the other party would normally have to pay.  42 U.S.C. § 1320a-7a(i)(6).

## Undercover Investigation

10.      The U.S. Department of Health and Human Services, Office of the Inspector General, Office of Investigations (referred to hereafter as HHS/OIG) is a federal agency which is responsible for investigating fraud and abuse in HHS programs, including the Medicare and Medicaid Programs.  During 2011 and 2012, HHS/OIG investigated allegations that the defendant was soliciting illegal kickbacks for patient referrals to health care providers.

11.      Between in or about March 2011 and June 2012, HHS/OIG agents conducted an undercover investigation, during which the defendant's conversations were video and audio recorded on fourteen occasions.  The defendant spoke with an undercover federal agent and a cooperating witness (referred to hereafter as "CW") who was affiliated with Patient Care Professionals.  Some of those conversations are described below.

3

### March 16, 2011 Meeting

12.     On or about March 16, 2011, the defendant met with the undercover agent and CW at the PCP office to discuss the terms of the kickback arrangement. The undercover agent introduced herself as the daughter of PCP's principal owner and further stated that she handled the financial matters for PCP. The undercover agent told the defendant that she wanted to "get the details" of the arrangement he had previously discussed with CW. The defendant told the undercover agent and CW that he would refer Doctor A's patients to PCP, if PCP would pay him 50% of the profit that PCP derived from the patients referred by him.

### April 5, 2011 Meeting

13.     On or about April 5, 2011, the defendant met with the undercover agent and CW at the PCP office to further discuss the payment and contractual arrangement with PCP. The defendant proposed that he and PCP enter into a simple contract to make it appear that PCP was paying him for financial, marketing, and patient consulting services. Specifically, the defendant stated: "[a]s long as I have a contract with you to provide any type of services, and if I can give you a bill at the end of the month for the dollar amount that you and I have agreed upon, and as long as you keep…writing that check…we'll keep the referrals coming."

14.     The defendant indicated that he would create fake invoices to make it look like PCP had a legitimate reason to pay him. The defendant would "schedule" the number of services he provided to match the profit report generated by his referrals to PCP. Specifically, the defendant said the purpose of these fake invoices was to make the money exchanged between the defendant and PCP "have all the paper trails and be for a legitimate cause."

15.     The defendant further proposed that PCP give him an equity stake in the company to better conceal the kickbacks. The defendant could then justify the compensation he received

4

for referrals as a "distribution of profits" to a partner in the company rather than for providing consulting services. Specifically, the defendant stated, "if we work out a deal where we invest in your company and we have a certain percentage then…nobody can come in and say why are you giving a partner this much."

16.    The defendant indicated a preference for Medicare patients. CW told the defendant that therapy was not available for Medicaid patients. The defendant responded: "we want to stay away from Medicaid as much as possible. What we'll do is I'll make sure that we don't have more than one Medicaid patient in there."

**April 8, 2011 E-mails and Consulting Contract**

17.    On or about April 8, 2011, the defendant, via e-mail, sent CW a copy of a consulting services contract. CW responded with an e-mail attachment containing the signed document and a request for the defendant's business address so that CW could send the original. The defendant responded that CW could send the original copy of the agreement to P.O. Box 4314, Chesterfield, Missouri 63006.

**April 14, 2011 E-mail and Prescription**

18.    On or about April 14, 2011, the defendant, via e-mail, sent CW information about Patient B.K. Defendant asked CW what "else was needed to get the patient going." CW responded via e-mail that a doctor's diagnosis and order for home health care was needed for Patient B.K. to be eligible for home health care.

19.    On or about April 15, 2011 Dr. A signed an order for Patient B.K. to receive home health care.

**April 20, 2011 Meeting**

20.    On or about April 20, 2011, the undercover agent and CW met with the defendant at Dr. A's office located on New Halls Ferry in St. Louis Missouri so Dr. A could meet the people to whom he was referring patients.  During the meeting, CW discussed with the defendant the services rendered to Patient B.K.  The defendant clarified who the point of contact should be after a patient was referred, specifically stating: "for any medical thing you need to coordinate the best thing is to just talk to [Dr. A's office staff]…[Y]ou can involve me if you feel you're not getting the necessary response."

**May 3, 2011 Call**

21.    On or about May 3, 2011, the undercover agent and CW contacted the defendant via telephone to discuss how the defendant wanted to be paid for referring Patient B.K.  The undercover agent asked if the payment for the referral should be sent to the defendant's or Dr. A's office.  The defendant stated:  "[n]othing goes to [Dr. A's] office…I will set up a time and come out to the office and…get the check…So this way, you know…we also have…our, you know regular meetings, that would be one of, you know, meeting times for us."

**May 11, 2011 Call**

22.    On or about May 11, 2011, CW was contacted by the defendant via telephone to discuss receiving patient referrals from Dr. B.  A short time later, CW received a call from Dr. B referring Patient K.C., a Medicare patient.

**June 29, 2011 Meeting**

23.    On or about June 29, 2011, the defendant met with the undercover agent and CW at the PCP office and received a $600 patient referral check.  CW showed the defendant a spreadsheet used to calculate the $600 payment, which was based on the services rendered to

Patient B.K. and Patient K.C. The defendant instructed the undercover agent to keep the records secret, stating specifically: "[t]his is one of those things that you don't...put it anywhere where your employees can't get to it. So this is obviously something just the three of us have access to."

24.     Also during the meeting the defendant said it was not worth pursuing referrals from Dr. A because 80% of his patients were Medicaid. The defendant said he would work to arrange referrals from Dr. C. The defendant thought Dr. C's practice would provide a more stable patient base for referrals.

**August 9, 2011 Meeting**

25.     On or about August 9, 2011, the defendant met with the undercover agent and CW at the PCP office and received a $275 patient referral payment. The defendant instructed CW to bill him only after the federal health program had reimbursed PCP for services rendered to the referred patients. The defendant specifically stated: "it's much easier because when you get paid you have your explanation of benefits, that's when we do the charge...I don't want to have you come out of your cash flow either. Cause, you know, this way you are cutting me a check when you haven't gotten paid."

**November 2, 2011 Meeting**

26.     On or about November 2, 2011, the defendant met with the undercover agent and CW at the PCP office and received an $87 referral payment.

**February 28, 2011 Call**

27.     On or about February 28, 2012, the undercover agent contacted the defendant, via telephone, after receiving a message requesting that she contact him. The defendant apologized for losing touch with PCP, but his imaging center project had kept him very busy. He told the

undercover agent that he had not forgotten about their relationship, but it would be a couple of months before he could return to home health referrals. Specifically, the defendant stated: "I'll be in touch with you once…the clinics start up and we start seeing some patients from the home health side."

**April 4, 2012 Meeting**

28. On or about April 4, 2012, the defendant, the undercover agent, and CW met at Dr. C's office located in Bridgeton, Missouri. Dr. C stated he could refer 5-7 patients to PCP a month. Dr. C stated that PCP should contact his coordinator, who determined where patients were referred.

29. After the meeting with Dr. C, the defendant, the undercover agent, and CW met the coordinator in the hallway of Dr. C's office.

30. The defendant, the undercover agent, and CW continued their conversation in the parking lot of Dr. C's office. The defendant stated he expected 1 to 2 referrals a week from Dr. C because the coordinator now knew to whom she should send home health referrals. The defendant instructed PCP to notify him if they were not getting any referrals from Dr. C's office so that he could investigate what the coordinator was doing with the referrals.

**April 20, 2012 Phone Call**

31. On or about April 20, 2012, the undercover agent had a telephone conversation with the defendant about the referrals from Dr. C's office. The defendant said that PCP missed out on two referrals because Dr. C's coordinator gave those referrals to another facility. In order to ensure that future referrals were sent to PCP, the defendant stated: "we have to take care of [the coordinator] so that [the coordinator] feels happy that, you know, the company that she is sending the referrals to is taking good care of her." The defendant suggested that "periodically

8

bringing [the coordinator] cookies and/or baseball tickets would make her inclined to send referrals to PCP."

### April 25, 2012 Meeting

32.     On or about April 25, 2012, CW went to Dr. C's office to deliver baseball tickets to Dr. C's coordinator.  CW and the coordinator agreed that Thursday would be a good day to come by and pick up the referral paperwork.

33.     Following the delivery of the baseball tickets to the coordinator, CW called the defendant to inform him what happened during the meeting.  The defendant predicted PCP will now start to see 1-2 referrals a week.  The defendant requested that he be informed weekly whether any referrals had been delivered.  The defendant recommended that PCP bring cookies weekly to Dr. C's office and give the coordinator a "special gift" every 2 or 3 months.  Specifically, the defendant stated: "we need to, you know keep her happy, so that she continues to do this for us."

### May 3, 2012 Meeting

34.     On or about May 3, 2012, CW returned to Dr. C's office to deliver treats and pick up referrals.  The defendant was present at the meeting.  The coordinator said that Dr. C was working with a couple patients that would be sent PCP's way.  Specifically, the coordinator stated, in the presence of the defendant: "you're the only one...when they hit my desk, they'll be hitting you."

## COUNTS 1 and 2
## HEALTH CARE FRAUD SCHEME
## 18 U.S.C. §§ 1347(a)(1) and 2

35.     Paragraphs 1 to 34 are incorporated by reference as if fully set out herein.

36.     It was part of the scheme and artifice to defraud a health care benefit plan that the defendant solicited payments from PCP for the referral of patients for home care services that Medicare and Medicaid paid for in whole or part.

37.     It was further part of the scheme and artifice to defraud that the defendant referred Medicare and Medicaid patients to PCP and received a "50/50" split of profits per the agreement with PCP.

38.     It was further part of the scheme and artifice to defraud that the defendant entered into a written agreement with PCP, for the purpose of concealing from Medicare that he had received illegal kickback payments for referring patients to PCP.

39.     It was part of the scheme and artifice to defraud that the defendant caused reimbursement claims to be submitted to Medicare and Medicaid for patients, whom he had referred to PCP in exchange for illegal kickback payments.

40.     On or about the dates listed below, in the Eastern District of Missouri,

### ZIA IQBAL,

the defendant herein, knowingly and willfully executed and attempted to execute, the above described scheme and artifice to defraud a health care benefit program, in connection with the delivery and payment for health benefits, items, and services, that is, the defendant submitted or caused the submission of reimbursement claims to Medicare and Medicaid for services to the patients listed below, for whom he had received illegal kickback payments.

10

| Count | Patient | Date of Service | Date of Claim | Insurer |
|-------|---------|-----------------|---------------|---------|
| 1 | B.K. | 4/21/2011 | 8/2/2011 | Medicaid |
| 2 | K.C. | 5/10/2011 | 9/23/2011 | Medicare |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

## COUNT 3
## ILLEGAL KICKBACK FOR PATIENT REFERRALS
### 42 U.S.C. §§ 1320a-7b(b)(l)(A) and 2

The Grand Jury further charges that:

41.     Paragraphs 1 to 34 are incorporated by reference as if fully set out herein.

42.     On or about March 16, 2011, in the Eastern District of Missouri,

### ZIA IQBAL,

the defendant herein, did knowingly and willfully solicit or receive remuneration (including any

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return

for referring an individual to a person for the furnishing or arranging for the furnishing of any

item or service for which payment may be made in whole and in part under the Federal health

care programs, that is, the defendant solicited a kickback, in the form of a 50/50 profit sharing

payment, from PCP for referring Medicare and Medicaid patients to PCP for home health

services

All in violation of Title 42, United States Code, Section 1320a-7b(b)(l)(A).

## COUNTS 4-5
## ILLEGAL KICKBACK FOR PATIENT REFERRALS
### 42 U.S.C. §§ 1320a-7b(b)(l)(A) and 2

The Grand Jury further charges that:

43.     Paragraphs 1 to 34 are incorporated by reference as if fully set out herein.

44.     On or about the dates listed below, in the Eastern District of Missouri,

**ZIA IQBAL,**

the defendant herein, did knowingly and willfully solicit or receive remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole and in part under the Federal health care programs, that is, the defendant solicited and received kickback payments from PCP for referring Medicare and Medicaid patients to PCP for home health services.

| Count | Date of Kickback Payment | Amount of Payment |
|-------|--------------------------|-------------------|
| 4 | June 29, 2011 | $600 |
| 5 | August 9, 2011 | $275 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(I)(A).

## COUNT 6
### FALSE STATEMENTS TO FEDERAL AGENTS
### 18 U.S.C. § 1001(a)(2)

The Grand Jury further charges that:

45.    Paragraphs 1 to 34 are incorporated by reference as if fully set out herein.

46.    On or about October 4, 2012, HHS/OIG agents executed a search warrant as part of its investigation of allegations that the defendant was receiving illegal kickbacks for the referral of Medicare and Medicaid referrals. The defendant was present at the site where the search warrant was executed and was questioned about the kickbacks.

47.    On or about October 4, 2012, within the Eastern District of Missouri,

**ZIA IQBAL,**

the defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation concerning a matter within the jurisdiction of the

executive branch of the United States, that is, he falsely stated to HHS/OIG and FBI agents that he had never received anything of value for referring Medicare or Medicaid patients for services, when he knew at the time he made the statement that the statement was false.

All in violation of Title 18, United States Code, Section 1001(a)(2)

A TRUE BILL.


_____
FOREPERSON

RICHARD G. CALLAHAN
United States Attorney


_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney

13