UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 4:15-CR-00343-CDP |
| | ) |
| ZIA IQBAL, | ) |
| | ) |
| Defendant. | ) |

# **TRIAL BRIEF**

COMES NOW the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Dorothy L. McMurtry and Gilbert C. Sison, Assistant United States Attorneys for said District, and submits the following trial brief in connection with the bench trial in the above-styled matter.

### I.   INTRODUCTION AND BACKGROUND

This brief is intended as a general guide for the Court.   It is not intended as a comprehensive statement of the Government's case; nor is it intended to fix, bind, or in any way limit the Government to a set of facts or a particular theory of proof.

**A.   Procedural History**

On October 7, 2012, federal agents executed a search and seizure warrant directed at Zia Iqbal (hereinafter "Iqbal") and his residence.   Iqbal's residence also served as his business address based on the business cards that he was handing out.   As a result of the warrant, agents seized various documents and computers.

On July 23, 2015, the grand jury returned a six-count indictment against Iqbal.   In Counts 1 and 2, the grand jury charged Iqbal with engaging in a health care fraud scheme, in violation of 18 U.S.C. § 1347 (a)(1) and 2.   Count 3 charged Iqbal with soliciting an illegal

kickback for patient referrals, in violation of 42 U.S.C. § 1320a-7b (b)(1)(A) and 2.   Counts 4 and 5 charged Iqbal with receiving an illegal kickback for patient referrals, in violation of 42 U.S.C. § 1320a-7b (b)(1)(A) and 2.   Count 6 charges Iqbal with making false statements to federal agents, in violation of 18 U.S.C. § 1001 (a)(2).

The Government has already moved to dismiss Counts 1 and 2, the health care fraud counts.   The Government will proceed with the remaining charges, Counts 3 through 6.

**B.**     **Overview of Anticipated Evidence**

Iqbal owned and operated a company called Spinnaker, LLC, located in Chesterfield, Missouri.   Spinnaker provided practice management, marketing, and consulting services to physicians and other health care providers.   Patient Care Professionals ("PCP") was a home health care agency, located in Ballwin Missouri.   PCP provided home care services to patients, whose personal physicians certified their need for home care services.

The U.S. Department of Health and Human Services, Office of the Inspector General, Office of Investigations ("HHS/OIG") is the federal agency responsible for investigating fraud, waste and abuse in programs such as Medicare and Medicaid.   Between March 2011 and June 2012, HHS/OIG agents conducted an undercover investigation, during which Iqbal's conversations were video and audio recorded on multiple occasions.

The undercover operation was initiated after a cooperating witness ("CW") had contacted an agent from HHS/OIG.   The CW was affiliated with PCP.   The CW indicated that Iqbal had reached out to PCP seeking to establish a relationship whereby Iqbal would funnel referrals to PCP in exchange for money.   As a result, an undercover operation was initiated whereby the CW and an undercover federal agent would try to capture evidence of Iqbal's proposed arrangement on video and audio.

On March 16, 2011, Iqbal met with the CW and an undercover federal agent, who was

posing as Linda Livesay ("Livesay"). Livesay held herself out as the daughter of the principal owner of PCP, who assisted the owner with the financial management of the company. Iqbal came to the PCP office to discuss the terms of the proposed kickback arrangement. Iqbal represented that he did practice management for a consortium of physicians. Iqbal claimed that he could get referral business from physicians because of the relationship he had with them through his management company. Specifically, because Iqbal was doing other services for these physicians, he could indirectly compensate those physicians in exchange for giving Iqbal the referral business. The business would then in turn be given to PCP in exchange for payment for those referrals.

Iqbal noted that one of the physicians he had a relationship with was a cardiologist, Dr. J.S., who had at any point in time between 25-30 patients who were homebound and could use home health care. Iqbal indicated that Dr. J.S.'s patients included both Medicare and Medicaid patients. Iqbal stated that he had a management/consulting contract with Dr. J.S. and had been working with him for several months. Iqbal also touted his close connection to the larger Pakistani physician community of which Dr. J.S. was a part and noted that there were potentially other physicians he could get to provide additional referrals.

Iqbal told Livesay and the CW that he would refer Doctor J.S.'s patients to PCP, if PCP would pay him 50% of the profit that PCP derived from the patients referred by him. Iqbal proposed that his business relationship with PCP be described in writing as a consulting agreement. The consulting agreement would set out a predetermined hourly rate and Iqbal would purport to do various marketing and consulting services for PCP. However, Iqbal's actual pay would be the 50% profit he would receive from him bringing patients to PCP. Iqbal would just send a bill for consulting services that would match the 50% profit that was agreed upon.

On April 5, 2011, Iqbal met with Livesay and the CW at the PCP office to further discuss

3

the payment and contractual arrangement with PCP.  Iqbal again proposed that he and PCP enter into a contract to make it appear that PCP was paying him for financial, marketing, and patient education services in exchange for $350/hour.  Iqbal would purport to provide services such as setting up seminars and sending out mailers, but ultimately, Iqbal's pay would be based on the 50% split in the profits from the referrals.  Whatever referral amount was due and owing to Iqbal would simply be divided by the agreed upon hourly rate, and then Iqbal would send a fake invoice.  Iqbal would "schedule" the number of services he provided to match the profit report generated by his referrals to PCP.  The purpose of these fake invoices was to ensure that the money exchanged between him and PCP had a valid paper trail.  Lastly, Iqbal confirmed that Dr. J.S. was on board with the arrangement with PCP and that PCP would start getting referrals from Dr. J.S.  Iqbal also noted that the arrangement would start with Dr. J.S. and be expanded to other physicians.

Sometime after that meeting, Iqbal, via e-mail, sent the CW a copy of a consulting services contract.  The CW responded with an e-mail attachment containing the signed document and a request for Iqbal's business address so that the CW could send the original.  Iqbal responded that the CW could send the original copy of the agreement to P.O. Box 4314, Chesterfield, Missouri 63006.  On April 14, 2011, Iqbal, via e-mail, sent the CW information about Patient B.K.  Iqbal asked the CW what "else was needed to get the patient going."  The CW responded, via e-mail, that a doctor's diagnosis and order for home health care was needed for Patient B.K. to be eligible for home health care.  Patient B.K. eventually received an order from Dr. J.S. to receive home health care.  Patient B.K. was a Medicaid patient.

On April 20, 2011, Livesay and the CW went to Dr. J.S.'s office located on New Halls Ferry in St. Louis Missouri.  Iqbal had arranged for the meeting so that Dr. J.S. could meet the people to whom he was referring patients.  During the meeting, Dr. J.S. confirmed that he had "tons" of patients for PCP.  Dr. J.S. also confirmed that Iqbal had talked to him about PCP and

4

that Dr. J.S. would take good care of PCP.   The CW then discussed with Iqbal the services rendered to Patient B.K.   Iqbal clarified who the point of contact should be after a patient was referred, indicating that for any medically-related matter that the CW should just talk to Dr. J.S.'s staff.   Iqbal did, however, indicate that he would involve himself if PCP felt that it was not getting the necessary response.

The meeting likewise confirmed the close relationship Iqbal had with Dr. J.S.   For example, Iqbal's own office was downstairs from Dr. J.S.   Iqbal also did Dr. J.S.'s billing and had access to Dr. J.S.'s patient charts.   Iqbal also noted that he advised Dr. J.S. on various financial aspects of Dr. J.S.'s practice and that he was helping him open another clinic in East St. Louis.   Iqbal even suggested that the relationship between him and PCP could include patients from East St. Louis so long as PCP could get licensed there.

On May 3, 2011, Livesay and the CW contacted Iqbal via telephone to discuss how Iqbal wanted to be paid for referring Patient B.K.   Livesay asked if the payment for the referral should be sent to Iqbal's or Dr. J.S.'s office.   The defendant indicated that nothing should go to Dr. J.S.'s office.   Rather, Iqbal stated:   "I will set up a time and come out to the office and . . . get the check . . . So this way, you know . . . we also have to have you know regular meetings that would be one of the meeting times for us."

On May 11, 2011, the CW was contacted by Iqbal via telephone to discuss receiving patient referrals from Dr. A.B.   A short time later, the CW received a call from Dr. A.B. referring Patient K.C., a Medicare patient.

On June 29, 2011, Iqbal met with Livesay and the CW at the PCP office.   The CW informed Iqbal they were still waiting on paperwork from Dr. A.B. to continue work on the recent patient referral from him, which was Patient K.C.   The CW gave Iqbal a $600 patient referral check.   The CW showed Iqbal a spreadsheet used to calculate the $600 payment, which was based

5

on the services rendered to Patient B.K. and Patient K.C.   Iqbal instructed Livesay to keep the records secret, stating specifically:   "It's just one of those things where – don't put it anywhere where your employees can get to it, so this is obviously something just the three of us should have access to."   Also during the meeting, Iqbal indicated it was not worth pursuing referrals from Dr. J.S. anymore because 80% of his patients were Medicaid.   Iqbal said he would work to arrange referrals from Dr. K.H.   The defendant thought Dr. K.H.'s practice would provide a more stable patient base for referrals.

On August 9, 2011, Iqbal met with Livesay and the CW at the PCP office and received a $275 patient referral payment.   Iqbal told CW that she should only bill him after the federal health program had reimbursed PCP for services rendered to the referred patients.   On November 2, 2011, Iqbal met with Livesay and the CW at the PCP office and received an $87 referral payment.

On February 28, 2012, Livesay contacted Iqbal, via telephone, after receiving a message requesting that she contact him.   Iqbal apologized for losing touch with PCP, but his imaging center project had kept him very busy.   He told Livesay that he had not forgotten about their relationship, but it would be a couple of months before he could return to home health referrals. Iqbal indicated that he would be in touch once the clinics start up and he started seeing some patients from the home health side.

On April 4, 2012, Iqbal, Livesay and the CW met at Dr. K.H.'s office located in Bridgeton, Missouri.   The meeting was arranged by Iqbal.   Dr. K.H. stated he could refer 5-7 patients to PCP a month.   Dr. K.H. stated that PCP should contact his coordinator, who determined where patients would be referred.   After the meeting with Dr. Hassan, Iqbal, Livesay and the CW met the coordinator in the hallway of Dr. K.H.'s office.

Iqbal, Livesay and the CW continued their conversation in the parking lot of Dr. K.H.'s office.   Iqbal stated he expected 1 to 2 referrals a week from Dr. K.H. because the coordinator

6

now knew to whom she should send home health referrals.  Iqbal instructed PCP to notify him if they were not getting any referrals from Dr. K.H.'s office so that he could investigate what the coordinator was doing with the referrals.  Iqbal reiterated that any profit from the referrals would be split with him.  Iqbal also warned that nothing should be given to the doctor because that would cross the line.  Iqbal also confirmed that he had a relationship with Dr. K.H.  Dr. K.H. rented out space to Iqbal and Iqbal was looking to bring a cardiologist into his practice.

On April 20, 2012, Livesay had a telephone conversation with Iqbal about the referrals from Dr. K.H.'s office.  Iqbal said that PCP missed out on two referrals because Dr. K.H.'s coordinator gave those referrals to another facility.  In order to ensure that future referrals were sent to PCP, Iqbal stated:  "we have to take care of [the coordinator] so that [the coordinator] feels happy that, you know, the company that she is sending the referrals to is taking good care of her."  Iqbal suggested that the CW periodically bring treats, but also provide bigger gifts such as baseball tickets.  Iqbal again reiterated that nothing should be given to Dr. K.H. Rather, Iqbal indicated that he would take care of Dr. K.H. because of the financial relationship and the understanding that he had with him.

On April 25, 2012, the CW went to Dr. K.H.'s office to deliver baseball tickets to Dr. K.H.'s coordinator.  The CW and the coordinator agreed that Thursday would be a good day to come by and pick up the referral paperwork.  Following the delivery of the baseball tickets to the coordinator, the CW called Iqbal to inform him what happened during the meeting.  Iqbal predicted PCP will now start to see 1-2 referrals a week.  Iqbal requested that he be informed weekly whether any referrals had been delivered.  Iqbal recommended that PCP bring cookies weekly to Dr. K.H.'s office and give the coordinator a "special gift" every 2 or 3 months to keep her happy.

On May 3, 2012, the CW returned to Dr. K.H.'s office to deliver treats and pick up

7

referrals. Iqbal was present at the meeting. The coordinator said that Dr. K.H. was working with a couple patients that would be sent PCP's way. Specifically, the coordinator stated, in the presence of Iqbal: "you're the only one . . . when they hit my desk, they'll be hitting you."

On October 5, 2012, a search warrant was executed at Iqbal's residence. During the execution of the search warrant, Iqbal was interviewed by agents. The interview was non-custodial and voluntary. Iqbal made several statements during that interview that the Government intends to offer at trial. Iqbal confirmed that he had a medical billing company and laboratory business under the Spinnaker, LLC name. Regarding the illegal kickback allegations, Iqbal denied multiple times ever soliciting physicians or any medical providers such as labs, home health agencies, etc., for the exchange of referrals for remuneration. Iqbal also denied soliciting medical providers to "funnel" patients to specific labs, home health agencies, etc., for money or any item of value. Iqbal confirmed that he knew this practice to be illegal and would never do something like that. Iqbal further stated that he had not gone to any medical providers in the community, such as labs, home health agencies, etc., and requested money and/or items of like value for the referral or funneling of patients. Iqbal further stated that he had never received money from anybody for referring/funneling patients.

## II. LEGAL/EVIDENTIARY MATTERS

In the following sections, the Government summarizes the elements of the charged offenses and addresses various legal and evidentiary matters that may rise prior to or during the trial of this case.

### A. Elements of the Offenses

As the present case is to be tried to the Court, the Government is not submitting a formal package of suggested jury instructions. The elements of the offenses, however, are provided to

8

assist the Court as it hears the evidence.

### 1. Count 3 – Solicitation of Illegal Kickback for Patient Referrals

Count 3 charges Iqbal with soliciting an illegal kickback for patient referrals, in violation of 42 U.S.C. § 1320a-7b.  The relevant statutory section states:

> Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –
>
> in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b (b)(1)(A).

Remuneration is defined broadly as anything of value, including money, goods, services, or the release or forgiveness of financial obligations the other party would normally have to pay. 42 U.S.C. § 1320a-7a(i)(6).

The statute also defines the term "Federal health care program" as "any plan or program that provides health benefits" and that is funded "in whole or in part, by the United States Government."  42 U.S.C. § 1320a-7b (f).  It also includes any "State health care program" as well.  *Id.*  The statute further provides that neither "actual knowledge" nor "specific intent" is required in order to find a violation.  42 U.S.C. § 1320a-7b (h).

Based on the Eighth Circuit's pattern jury instructions, the elements for Count 3 are as follows:

> *One*, the defendant knowingly and willfully solicited a kickback in the form of a 50/50 profit sharing payment from PCP for referring Medicare and Medicaid patients to PCP for home health services;
>
> *Two*, the 50/50 profit sharing payment was solicited primarily in order to induce the referral of a patient insured by a federal health care program;

9

   *Three*, the patient's services were covered, in whole or in part, by a federal health care program; and

   *Four*, Medicare and Medicaid are federal health care programs.

*See* Eighth Circuit Model Instruction No. 6.42.1320 (as modified).

  At present, the Eighth Circuit Model Instructions recommend against a special definition of "willful," except in certain enumerated cases. *See* Eighth Circuit Model Instruction 7.02. Rather, the model instructions suggest that the words "voluntarily and knowingly" be used. *Id.*

  Here, the Government's evidence centers on the March 16, 2011 and April 5, 2011 undercover recordings between Iqbal, Livesay and the CW. The first element is satisfied because Iqbal did solicit a kickback when he proposed an arrangement to PCP whereby he would receive 50% of the profits in exchange for referrals that he would direct to PCP. The second element is satisfied because that proposed arrangement was solicited in order to induce the referral of a patient insured by a federal health care program. Iqbal held himself out and stated that he was in a position to induce such referrals from Dr. J.S. because of his relationship with him. Finally, the third and fourth elements are satisfied because Dr. J.S.'s patients included both Medicare and Medicaid, both of which are federal health care programs. In addition, the patients eventually received as a result of this solicitation, Patients B.K. and K.C., were Medicaid and Medicare patients respectively.

  **2. Counts 4 and 5 – Receipt of Illegal Kickbacks for Patient Referrals**

  Counts 4 and 5 charge Iqbal with receiving illegal kickbacks for patient referrals, in violation of 42 U.S.C. § 1320a-7b. The receipt of illegal kickbacks is covered by the same statutory section mentioned in Part II.A.1 above.

  The Eighth Circuit pattern jury instruction for Counts 4 and 5 is likewise the same and has four elements, which are:

10

>*One*, the defendant knowingly and willfully received a $600 payment on June 29, 2011 and a $275 payment on August 9, 2011;
>
>*Two*, the aforementioned $600 payment and $275 payment were paid primarily in order to induce the referral of a patient insured by a federal health care program;
>
>*Three*, the patient's services were covered, in whole or in part, by a federal health care program; and
>
>*Four*, Medicare and Medicaid are federal health care programs.

*See* Eighth Circuit Model Instruction No. 6.42.1320 (as modified).

Whereas Count 3 focuses on the solicitation that Iqbal made, Counts 4 and 5 focus on the payments that Iqbal received for the referrals. The first element is satisfied because Iqbal did receive two referral payments from PCP for patients that were eventually referred to PCP. The second element is satisfied because the payments to Iqbal were clearly made to induce such referrals and for those referrals to continue. In fact, the file of Patient B.K. was sent directly by Iqbal to the CW, thus confirming that Iqbal was in a position to induce such referrals from Dr. J.S. Finally, as to the third and fourth elements, those are clearly satisfied because the aforementioned payments were based in part on services performed for Patient B.K. and Patient K.C., who were Medicaid and Medicare patients respectively.

### 3. Count 6 – Making False Statements to Federal Agents

Count 6 charges Iqbal with making a false statement to federal agents, in violation of 18 U.S.C. § 1001. The relevant statutory section states:

>Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –
>
>makes any materially false, fictitious, or fraudulent statement or representation;
>
>shall be fined under this title, imprisoned not more than 5 years . . .

18 U.S.C. § 1001 (a)(2).

11

The Eighth Circuit pattern jury instructions identify five elements for Count 6, which are:

*One*, the defendant knowingly and intentionally made the statement as charged;

*Two*, that statement was false;

*Three*, the statement concerned a material fact;

*Four*, the statement was made about a matter within the jurisdiction of the HHS/OIG; and

*Five*, the defendant knew it was untrue when it was made.

*See* Eighth Circuit Model Instruction No. 6.18.1001B (as modified).

A few key definitions should also be kept in mind. First, a statement is "false" if it was untrue when it was made. A "material fact" is a fact that would naturally influence or is capable of influencing a decision of the agency. Whether a statement is "material" does not depend on whether the agency was actually deceived or misled. *See* Eighth Circuit Model Instruction No. 6.18.1001B.

Here, the Government's primary evidence on this count is the statements that Iqbal gave to federal agents while his residence was being searched. Based on the evidence presented as to Counts 3 through 5, the Government believes that it will be able to meet its burden of proof regarding this count. The first element is satisfied because Iqbal knowingly and intentionally made a statement as charged in the Indictment, which was that Iqbal never received anything of value for referring Medicare or Medicaid patients for services. The second element, *i.e.*, that the statement was false, is satisfied because the evidence clearly shows that Iqbal did receive something of value for referring Medicare or Medicaid patients for services. The third element, *i.e.*, the statement was related to a material fact, is satisfied because whether Iqbal received anything of value in exchange for the referral of patients was central to the instant investigation. As to the fourth element, that too is satisfied because Iqbal's statement was made about a matter

12

that was within the jurisdiction of the HHS/OIG, *i.e.*, the investigation into illegal kickbacks. Finally, the fifth element is satisfied, *i.e.*, that the statement was untrue when made because the evidence clearly shows that Iqbal did receive something of value in exchange for referrals.

**B.     Ability to Induce and/or Influence Referrals**

It is anticipated that Iqbal will raise a legal defense arguing that the anti-kickback statute is not applicable to him.    The defense appears to be centered on the notion that there has to be a nexus established between the person being remunerated for a kickback and that person's ability to effectuate a referral in exchange.    The defense is based on the case of *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004).

In *Miles*, the defendants had formed a home health care company called APRO.    The Government argued at trial that APRO had paid the owners of Premier Public Relations ("PPR") to distribute information about APRO's home health services to doctors in the Houston area. When a physician determined that home health services were needed, the physician's office would contact the owners of PPR who would then furnish the patient's name and Medicare number for billing purposes to APRO.    APRO paid PPR $300 for each Medicare patient who became an APRO client as a result of PPR's efforts.    The Government took the position that these payments were illegal kickbacks under the statute.    *See Miles*, 360 F.3d at 479.

A critical point to note is that on appeal, the only issue in dispute between the parties was whether PPR's activities constituted referrals within the meaning of the statute.    *See Miles*, 360 F.3d at 480.    The appellants (owners of APRO) argued that they could not have violated the statute because PPR never actually referred anyone to APRO, but rather PPR simply engaged in advertising activities on behalf of APRO.    *Id.*    According to the appellants, the statute was designed to ensure that a doctor's independent judgment was not compromised by promises of payment and PPR did not unduly influence the doctor's decisions.    *Id.*

13

Based on the evidence adduced at trial, the Fifth Circuit agreed and reversed the anti-kickback statute convictions. *See Miles*, 360 F.3d at 480. The court reasoned that PPR supplied promotional materials to the Houston area doctors describing APRO's home health services. After a doctor decided to send a patient to APRO, the doctor's office contacted PPR, which then supplied the necessary information to APRO. The court further noted that there was no evidence that PPR had any authority to act on behalf of a physician in selecting the particular home health care provider. Thus, the court concluded that the payments from APRO to PPR were not made to the "relevant decisionmaker as an inducement or kickback for sending patients to APRO." *Id.*

Obviously, Iqbal will attempt to rely on *Miles* to claim that he too was not the "relevant decisionmaker" and thus the payments made to him do not implicate the statute. The Fifth Circuit, however, appeared to backtrack from its earlier *Miles* decision in *United States v. Shoemaker*, 746 F.3d 614 (5th Cir. 2014). The *Shoemaker* case involved a bribe and kickback scheme involving the Tri-Lakes Medical Center ("TLMC"), a community hospital in Panola County, Mississippi. The County as the 60% owner of TLMC appointed David Chandler ("Chandler") to serve as Chairman of TLMC's Board of Trustees. Chandler regularly met with Shoemaker, who was then TLMC's Chief Operating Officer ("COO"). Garner owned and operated a nurse staffing business known as Guardian Angel Nursing ("GAN"). TLMC and GAN entered into a contract after Chandler had arranged two meetings between company representatives and Shoemaker. Soon thereafter, Chandler requested that Garner pay him $5 for every nursing hour his company billed at TLMC. The $5 was in return for Chandler's ensuring that TLMC used Garner's company for contract nurses and paid Garner's bills in a timely manner. Upon Garner's request, Chandler created invoices that did not directly correlate to billed hours but rather looked as if they were for consulting or tax services. *See Shoemaker*,

14

746 F.3d at 616-617.

The district court read the indictment as alleging two distinct conspiracies. The first was a conspiracy between Garner, Shoemaker and Chandler to pay kickbacks to Chandler. The second was a conspiracy between the same individuals to pay kickbacks to Shoemaker. *See Shoemaker*, 746 F.3d at 626. The district court granted judgments of acquittal because of proof issues with respect to the Government's case regarding both conspiracies. Regarding the first conspiracy, the district court ruled that there was no evidence to establish that Chandler was the "relevant decisionmaker." *Id.* And, as to the second conspiracy, the district court found no evidence of any agreement underlying the conspiracy. *Id.*

On appeal, the Fifth Circuit reversed the district court and found that there was sufficient evidence to support Garner's and Shoemaker's convictions. *See Shoemaker*, 746 F.3d at 627. The Fifth Circuit noted that there was evidence that Chandler paid Shoemaker in order to maintain influence over Shoemaker and to induce him to recommend that Shoemaker direct business to Garner's company. The Government, Shoemaker and Garner all agreed that the district court's reading of *Miles* was correct. In fact, the Government argued that Chandler was a "relevant decisionmaker" within the meaning of the decision. However, the Fifth Circuit criticized the district court's reliance on the "relevant decisionmaker" standard in *Miles*, wherein "liability cannot attach unless the 'person' who receives remuneration is a 'relevant decisionmaker' with formal authority to effect the desired referral or recommendation." *Id.* The Fifth Circuit reasoned that the district court's decision "drastically" limited the meaning of "any person" in the anti-kickback statute and had no applicability to the case.

The Fifth Circuit noted that it did not hold in *Miles* that the "relevant decisionmaker" status was an independent substantive requirement of the statute. The Fifth Circuit went on to distinguish *Miles* as follows:

15

> *Miles* drew a distinction not between types of *payees*—"relevant decisionmakers" and others—but between a *payer's* intent to induce "referrals," which is illegal, and the intent to compensate advertisers, which is permissible. Moreover, the factual and procedural context of that case constrained our holding. *Miles* accordingly stands for a narrow legal proposition: Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment "to refer an individual to a person" under 42 U.S.C. § 1320a–7b(b)(2)(A).
>
> *Miles* is inapplicable to the facts before us. Here, advertising services are not at issue. Moreover, sufficient evidence established that the payments to Chandler aimed to induce him to "recommend" Garner's company. That is, in paying Chandler, Garner was not asking for a brochure bearing his company's name to be distributed to TLMC staff; rather, enough evidence showed that he wanted Chandler to exploit his personal access to TLMC executives, including Shoemaker, and to ensure that TLMC favored Garner's company when it chose nursing services. This conduct is an archetypal example of the undue influence prohibited by the statute.

*Shoemaker*, 746 F.3d at 628-629.

The Fifth Circuit stated that employing the "relevant decisionmaker" standard "would be tantamount to rewriting the statutory text[.]" The Fifth Circuit also noted the absurd consequences that would result if it were a requirement of the statute. The Fifth Circuit stated the following:

> By its logic, if a bribe-giver wanted to avoid liability, he could simply identify the individual with direct operational authority over the desired decision, and bribe a manager who is at least one level removed in the chain of command, since the manager would have no direct, formal, day-to-day authority over the targeted decision. Alternatively, he could also avoid liability by paying a third party external to the organization to, in turn, bribe the decisionmaker within the organization. Such a view of the law ignores the statutory text, which limits liability not by narrowing the field of "any person," but by defining culpable intent. Indeed, *intent* was the focus of our inquiry in *Miles*—specifically the question of whether the evidence could establish intent to induce "referrals." The focus on intent, not titles or formal authority, also accords with Congress's concerns in enacting the statute—to broaden liability to reach operatives who leverage fluid, informal power and influence.

*Shoemaker*, 746 F.3d at 629.

Here, any argument that Iqbal should avoid anti-kickback liability because he did not have the authority to select and/or refer patients should be rejected. The Government believes

16

that its evidence will show that Iqbal held himself out as being able to influence physicians for referrals.  These were physicians with whom he had an existing working relationship.  In fact, the evidence will show that the patient files of one of the referrals came directly from Iqbal.  In concluding that the payments in *Shoemaker* fell within the anti-kickback statute, the Fifth Circuit noted that the payments were designed to exploit personal access over those decision makers who would choose nursing services.  This is no different than the instant case where the referrals paid to Iqbal were designed to exploit his personal access to the physicians who would ultimately be responsible for making the referrals.  And, as the Fifth Circuit noted these type of payments are the "archetypal example of the undue influence prohibited by the statute."

C.   **Evidence Presentation**

The bulk of the evidence to be presented by the Government is in the form of video and audio recordings that were compiled as a result of the undercover operation against Iqbal.  With respect to the video and audio tapes to be played, the Government intends to play redacted or shortened versions of each recording.  The redacted versions take out what the Government believes to be extraneous or otherwise irrelevant information for the purpose of shortening the Government's presentation.  Thus, the Government intends to offer into evidence the unredacted recording, the redacted recording and the portion of the transcript related to the redacted recording.

The Government also has other documentary type exhibits to be introduced into evidence but they are not voluminous.  Such evidence will include, but is not limited to, copies of checks, e-mails with attachments, contracts and agreements, corporate documents, bank records and profit and loss statements.  The Government anticipates that there are less than 20 documentary exhibits, which will be introduced into evidence.

17

**D.     Stipulations**

The parties have stipulated as to the admissibility of various claims data related to Medicare and Medicaid.    At present, the final form of this stipulation is not complete.    The Government has also requested that Iqbal stipulate to the admissibility of checks that Iqbal received for the illegal kickbacks.    As of the filing of this motion, Iqbal has not agreed to such a stipulation.

The parties intend to make clear that by stipulating to any specific exhibit or category of evidence, Iqbal is not conceding any issue related to knowledge or intent to commit any illegal act reflected in the Indictment.

**E.     Motions in *Limine***

As of the filing of this brief, the Government anticipates filing a motion in *limine* regarding the preclusion of any defense relying on advice of counsel and/or entrapment.    Based on the recordings, Iqbal may try to assert that the arrangement he entered into with PCP was legal and/or permissible because he had lawyers look into it.    However, to date the Government has not received any discovery relating to such a defense.    Thus, to the extent that Iqbal wishes to raise such a defense, it should be precluded.    As to entrapment, the Government believes that the prima facie elements for such a defense are not present and thus cannot be relied upon.    The Government is currently not aware of any motions in *limine* to be filed by Iqbal.

Dated:    January 15, 2016.

                                      Respectfully Submitted,

                                      RICHARD G. CALLAHAN
                                      United States Attorney

                                        */s/ Gilbert C. Sison*
                                        DOROTHY L. MCMURTRY, #37727MO
                                        GILBERT C. SISON, #52346MO
                                        Assistant United States Attorneys
                                        111 S. 10th Street, Room 20.333
                                        St. Louis, Missouri 63102
                                        (314) 539-2200

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 4:15-CR-00343-CDP |
| ) | |
| ZIA IQBAL, ) | |
| ) | |
| Defendant. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2016, the foregoing was filed electronically with the Clerk of the Court for service upon the following counsel:

Mr. Eric Vickers – eric_vickers@hotmail.com

*Attorney for Defendant, Zia Iqbal*

s/ *Gilbert C. Sison*
DOROTHY L. MCMURTRY, #37727MO
GILBERT C. SISON, #52346MO
Assistant United States Attorneys
111 S. 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

20