UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 343 CDP |
| | ) | |
| ZIA IQBAL, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER, FINDINGS AND CONCLUSIONS

Defendant Zia Iqbal waived jury trial and the Court held a bench trial, which began on January 19, 2016.  The trial concluded after two days of evidence.  On February 10, 2016, I reconvened the trial for the purpose of stating my decision on the charges in open court.  At that time I announced my finding of guilt on the charges in the indictment, for the reasons stated on the record in open court and as set forth in more detail here.

### Findings and Conclusions

Defendant went to trial on Counts 3, 4, 5 and 6 of the indictment, as the government dismissed Counts 1 and 2 before trial.  The Court makes the following findings and conclusions, as required upon request under Rule 23(c), Federal Rules of Criminal Procedure.

## Counts 3, 4 and 5

Counts 3, 4 and 5 of the indictment charge defendant Zia Iqbal with soliciting or receiving remuneration for referring an individual to a health service provider for which payment would be made under federal health care programs, in violation of Title 42, United States code, Section 1320a-7(b)(1)(A).  Defendant argues that the government has not shown that he made any payments to the doctors or had any actual ability to control the referrals of the patients, and that therefore the government's case fails.  But the statute does not require proof that the referring doctors receive the remuneration.  The evidence showed, beyond a reasonable doubt, that defendant solicited kickbacks, represented that he could control the referrals, and actually received money for the few referrals that were made through his efforts.  This is sufficient, and I find that the government has met its burden of proving beyond a reasonable doubt each of the elements of the charged crimes.

*Count 3*

Count 3 specifically charges that on or about March 16, 2011 defendant solicited a kickback in the form of a 50/50 profit sharing payment from Professional Care Professionals (PCP) for referring Medicare and Medicaid patients to PCP for home health services.  To prove the crime charged in Count 3

the government was required to prove beyond a reasonable doubt that:

One, the defendant knowingly and willfully solicited a kickback in the form of a 50/50 profit sharing payment from PCP; and

Two, the 50/50 profit sharing payment was solicited primarily in order to induce the referral of patients insured by Medicare or Medicaid; and

Three, the services of the patients to be referred were covered, in whole or in part by Medicare or Medicaid.

The evidence supporting this count shows that defendant Iqbal contacted Millie Seager, who is the administrator and part owner of PCP, and said that he managed a large number of medical practices, and that he could see to it that those doctors referred their patients to PCP when they needed home health services. He said they would have to have some kind of arrangement because both he and PCP could make a lot of money, which he suggested could be as much as $10,000 for him and $10,000 for PCP per month. Saeger said she was not interested but took his card.

Saeger later contacted federal officials, because she was concerned that what Iqbal had proposed was an illegal cash for referral (kickback) arrangement. An agent for the Department of Health and Human Services Office of Inspector General, Stacey Jordan, responded, and eventually they set up an undercover

operation, whereby another Agent, Linda Hanley, posed as "Linda Livesay" and represented herself as the daughter of the other owner of PCP and the person who handled the financial details.  Saeger and Hanley then conducted a series of recorded telephone and in person meetings with Iqbal.

On March 16, 2011, Saeger and Hanley met with Iqbal at PCP's offices. The meeting was video and audio recorded.  Iqbal again stated that he worked with a large number of physicians and that he could assure that those doctors referred patients to PCP.  They discussed that the patients are mostly Medicare and Medicaid patients, with some private pay patients. He discussed at great length the proposal that they would share any profits from those patients on a 50/50 basis.  He explained that he would indirectly compensate his physician clients by discounting the cost of other services he provided to them, and that would avoid getting into a kickback situation.  Idbal said that as long as they were not compensating the referral source for the number of referrals, then they would be ok with Medicare.

Iqbal also explained that he and PCP would enter into a contract showing that he was providing other services to PCP, such as marketing and patient education.  The contract would indicate a set hourly rate for that other work.  Once everyone knew the amount of profit generated on a particular referral, then they would determine what Iqbal's 50% share would be, and Iqbal would send a bill

4

showing that he had performed marketing or patient education services for the number of hours that would match his amount of the profit generated from the referral. He explained that this form of contract would not raise questions and that, while what they were doing would be legal because he was not the referral source, if they wrote down what they were actually doing somebody might look at it and think he was being paid for channeling the patients to PCP.

This evidence meets the government's burden of proving Iqbal guilty of Count 3 beyond a reasonable doubt. Iqbal solicited remuneration in the form of 50% of the profits generated by patients for whom he arranged referrals. The payments solicited were for the purpose of inducing PCP to make the referrals. He knew the patients were covered by Medicare and Medicaid so the payments would come from a federal health care program. And his suggestions that they should write up and use a contract that masked the true purpose of the payments is further evidence of his intent and willfulness.

*Counts 4 and 5*

Counts 4 and 5 charge that defendant solicited and received kickbacks from PCP for referring patients, specifically, that he received a $600 payment on June 29, 2011 and a $275 payment on August 9, 2011. To prove the crimes charged in these counts the government was required to prove beyond a reasonable doubt:

5

One, the defendant knowingly and willfully received the $600 payment on June 29, 2011 and the $275 payment on August 9, 2011 from PCP; and

Two, the payments were paid primarily in order to induce the referral of patients insured by Medicare or Medicaid; and

Three, the services of the patients referred were covered, in whole or in part by Medicare or Medicaid.

After the meeting discussed in Count 3 above, Iqbal had more than fifteen more meetings or phone calls with Saeger and Hanley (again posing as "Linda Livesay"), almost all of which were recorded.  They executed the contract that he proposed, although he never sent any invoices as contemplated by that contract.  In April of 2011 they met at the office of one of the doctors that Iqbal claimed to represent.  Although it is clear from the context that Iqbal had some relationship with the doctor and was apparently providing some services to him, there is no evidence from this meeting or otherwise that he actually managed this doctor's practice, as he had represented to PCP.  In any event, the doctor eventually referred a Medicaid patient to PCP for home health services.  Later, a different doctor Iqbal had claimed to represent referred a Medicare patient to PCP.  The recorded conversations frequently reference Medicaid and Medicare, so it is clear that Iqbal knew the patients' care was covered, at least in part, by those programs.

6

As part of the undercover operations, Saeger prepared a spreadsheet showing that PCP had made a gross profit of $1201.36 on the referrals.  After further recorded discussions, on June 29, 2011, Saeger sent a check to Iqbal in the amount of $600.  Iqbal received the check and deposited the funds in his bank account.  Saeger later prepared another spreadsheet showing additional profit of $551.18 on the Medicare patient.  On August 9, 2011, she sent him a check in the amount of $275.59, representing 50% of those profits.  Iqbal also received and deposited that check.  In both instance, the spreadsheet numbers did not accurately reflect the profits PCP made on the Medicare and Medicaid reimbursements for these patients – the numbers were inflated for purposes of the undercover investigation and the actual gross profits were lower.

Iqbal continued to meet with Saeger and Hanley, although the meetings tapered off in the fall of 2011.  Iqbal introduced them to yet a third doctor in early 2012, and said they would begin getting referrals from that doctor as well.  When they did not receive referrals, Iqbal told them that they needed to give something to the person at the doctor's office who was responsible for the referrals.  They had numerous discussions about what to give – Iqbal indicated that cookies would not be enough, but that they could not give cash.  Eventually they agreed to provide baseball tickets to the person, and they did provide the baseball tickets.  After that,

7

they received a referral from the doctor's office.

Iqbal argues that the evidence does not show that he actually controlled the referrals or that he actually made any payments to the doctors or doctors' staffs to induce the referrals for which he was paid.  He points out the recordings show he stated that they should not do anything illegal, and that it was not illegal as long as there were no direct payments from PCP to the people responsible for the referrals, and he especially points to his statement that they should not give cash to the last doctor's employee.

Iqbal relies on the case of *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004) for the proposition that because no payments went to the "relevant decision-maker" there is no violation of the statute.  Although the conviction in *Miles* was reversed, the case has been limited to its facts by a later Fifth Circuit case, *United States v. Shoemaker,* 746 F.3d 614 (5th Cir. 2014).  In *Shoemaker* the court pointed out that the *Miles* case was focused not on the relevant decision-maker but instead on the payer's intent to induce referrals.  *Id.* at 628.  Here there is no doubt but that Iqbal represented to PCP that he could cause the doctors to make the referrals, and would do so if PCP agreed to pay him a share of the profits.  PCP agreed to make the payments to induce the referrals, and later made the payments as a direct result of having received the referrals.  This is a clear payment based on the value of the

8

referrals, which is a violation of the law.

The Eighth Circuit has not followed *Miles*, although there are very few reported cases under this statute from our Circuit. In *United States v. Jain,* 93 F.3d 436 (8th Cir. 1996), the Court affirmed a conviction where the defendant had attempted to shield his receipt of kickbacks for referrals by using a contract purporting to pay him for non-existent marketing services, which is very similar to the situation here. In *United States v. Yielding,* 657 F.3d 688 (8th Cir. 2011), the Court approved a jury instruction telling the jury that it could find the defendant guilty if the money was paid "primarily in order to induce" the use of the supplier's services.

I conclude that the legal distinction urged by defendant is not supported by the language of the statute. He clearly both solicited and received payments in return for his causing patients to be referred to PCP. Although there is some appeal to his argument that he was simply defrauding PCP by falsely stating he could corruptly influence the referrals (which in any event would not be a defense to the solicitation charge in Count 3), I find that the government has shown, beyond a reasonable doubt, that he accepted remuneration for inducing the referrals, and that therefore he is guilty of Counts 4 and 5.

## Count 6

In Count 6 defendant is charged with, on or about October 4, 2012, knowingly and willfully making a materially false, fictitious and fraudulent statement and representation concerning a matter within the jurisdiction of the executive branch of the United States, that is, he falsely stated to federal agents that he had never received anything of value for referring Medicare or Medicaid patients for services, when he knew the statement was false, in violation of 18 U.S.C. § 1001(a)(2).

The elements of this crime are:

One, the defendant knowingly and intentionally made the statement as charged;

Two, that statement was false;

Three, the statement concerned a material fact;

Four, the statement was made about a matter within the jurisdiction of the federal agency to whom he made the statement; and

Five, the defendant knew it was untrue when it was made.

The evidence showed that on October 4, 2012, agents executed a search warrant at Iqbal's home. He was at home when they arrived and agreed to answer questions. Agents repeatedly asked him whether he had ever received money or

anything of value for funneling or referring patients.  They asked the question several different ways at several different times, and each time he stated that he had not done that.

The statement was false and defendant made the statement knowingly and intentionally.  Iqbal knew his denials were untrue because he had in fact received money from PCP for causing the referrals to be made to PCP.  The statement concerned a matter within the jurisdiction of the Department of Health and Human Services, Office of Investigator General.  That office was investigating Medicare and Medicaid kickbacks and Iqbal's false denial was material to their investigation.  The government has proven Count 6 beyond a reasonable doubt.

### Conclusion

As I have found defendant guilty as charged and pronounced the finding of guilt in open court in defendant's presence, I will set the matter for sentencing.

Accordingly,

**IT IS HEREBY ORDERED** that the **sentencing** in this matter is set for **Thursday, May 12, 2016 at 2:00 p.m.** in Courtroom 14-South.  All Objections to the presentence report must be filed no later than **April 21, 2016.**  If testimony is expected counsel must notify the court at least one week before sentencing.

**IT IS FURTHER ORDERED** that the parties must file any sentencing memoranda no later than **May 5, 2016** except that a response to a sentencing memorandum may be filed no later than **May 9, 2016.**

                                                             _____
                                                             CATHERINE D. PERRY
                                                             UNITED STATES DISTRICT JUDGE

Dated this 10th day of February, 2016.